1

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   CENTRAL DIVISION AT LEXINGTON
                                - - -
 3
     UNITED STATES OF AMERICA,      : Docket No. 22-cr-37-2
 4                                  :
                          Plaintiff, : Lexington, Kentucky
 5                                  : Friday, January 27, 2023
                                    : 1:00 p.m.
 6      v.                          :
                                    :
 7   MARC ANDRE PETITFRERE,         :
                                    :
 8                        Defendant. :

 9                              - - -
                     TRANSCRIPT OF SENTENCING
10                    BEFORE DANNY C. REEVES
           UNITED STATES CHIEF DISTRICT COURT JUDGE
11                              - - -

12   APPEARANCES:

13   For the United States:      RON L. WALKER, Jr., ESQ.
                                 U.S. Attorney's Office
14                               260 W. Vine Street
                                 Suite 300
15                               Lexington, Kentucky 40507

16   For the Defendant:          ROBERT L. ABELL, ESQ.
                                 Robert Abell Law
17                               120 N. Upper Street
                                 P.O. Box 983
18                               Lexington, Kentucky 40588

19   Court Reporter:             ELAINE S. HABERER, RPR
                                 Official Court Reporter
20                               101 Barr Street
                                 Lexington, Kentucky 40507
21                               (859) 469-7456

22

23

24
          Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

1          (Proceedings commenced in open court at 1:57 a.m.)

2          THE COURT:  Thank you.  Madam Clerk, would you call

3    the matter that's scheduled -- it was originally scheduled for

4    1:00, this afternoon.

5          COURTROOM DEPUTY:  Yes, Your Honor.

6          Lexington Criminal Action Number 22-37, United States of

7    America versus Marc Andre Petitfrere, called for sentencing.

8          THE COURT:  Thank you.

9          Would counsel state their appearances, please?

10         Mr. Walker.

11         MR. WALKER:  Good afternoon, Your Honor.  Ron Walker

12   on behalf of the United States.

13         THE COURT:  Thank you.

14         Mr. Abell.

15         MR. ABELL:  May it please the Court, Your Honor,

16   Robert Abell on behalf of Marc Petitfrere, who is seated here

17   to my right.

18         THE COURT:  All right.  Thank you.  This matter is

19   scheduled for a sentencing hearing this afternoon.  Before we

20   proceed with the hearing, let me first confirm that

21   Mr. Petitfrere has had the opportunity to review his

22   presentence report and to discuss the report with counsel to

23   his satisfaction; is that correct?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Your presentence report will be filed in

3

1    the record under seal.  It's available if the parties should

2    need it, it's not available for the general public to review.

3    There is one objection that does affect the guideline

4    calculations in the case.  It's set forth in the addendum to

5    the presentence report.  The defendant objects to the

6    two-level enhancement that is included in the report under

7    United States sentencing guidelines Section 2D1.1(b)(12) for

8    operating a stash house.  And specifically, the offense level

9    is increased by two levels, as set forth in paragraph 23.  So

10   we'll address that issue initially.

11   Mr. Abell, this is a case in which the defendant entered

12   a plea to Count 9 of maintaining a drug-involved premises

13   under Title 21, Section 856(a)(2).  The two-level enhancement

14   is essentially modeled after that statutory section following

15   the Fair Sentencing Act of 2010, it was added by the

16   Sentencing Commission at the direction of Congress.

17   The defendant did enter a plea and acknowledged the

18   elements, so I'll hear from you at this time as to whether the

19   objection should be sustained as to paragraph 23.

20   MR. ABELL:  Your Honor, I see a different -- to me,

21   for the enhancement to apply, honestly, it seems a stricter

22   standard to violate the statute.

23   THE COURT:  I'm sorry, say that again, please.

24   MR. ABELL:  I think the enhancement requires a

25   greater application than the stat -- more culpability, more

4

1    use than the statute does.  It talks in terms of it being a

2    primary in the *Bell* case, it referred to a significant role.

3    And I think the best argument on this is the distinction in

4    the facts.

5        *Bell* involved about 20 months of it being a retail

6    distribution and manufacturing center; the defendant in that

7    case distributing cocaine.

8        Here you have basically one-day involvement.  A quantity

9    is picked up, which is in the possession of the co-defendants

10   Sparks and Cryns and they're stopped later that day.  A search

11   warrant is executed and additional quantities of fentanyl and

12   methamphetamine.  So it was used as a storage, but the

13   circumstances here aren't sufficiently aggravating to

14   distinguish it.

15       We presume people involved in a drug conspiracy likely

16   are storing some drugs in their residence.  This is a true

17   residence; people actually living there as opposed to a stash

18   house.

19           THE COURT:  So under *Bell* and under *Johnson*, it

20   doesn't have to be the primary purpose, it has to be a

21   purpose.  Not the primary purpose, but a purpose, a primary

22   purpose.

23           MR. ABELL:  Or a significant purpose.

24           THE COURT:  Well, what was the significant purpose --

25   what are the facts in both *Bell* and *Johnson*?

1      MR. ABELL:  Well, in *Bell* --

2      THE COURT:  Let's talk about *Johnson* first.  *Johnson*

3  involved marijuana storage.  And the defendant made the

4  argument in that case that because this was limited to one

5  area of the house, over a limited period of time and there

6  were only three deliveries, when you calculate the percentage,

7  it was a very small percentage of time that the drug was

8  used -- or the house was used for storage.  And then, there

9  were three occasions in which the drugs were picked up.

10      And as Chief Judge Sutton indicated, it's not the way you

11  look at it, because when you're looking at a house that's

12  being used for storage, it's continuous storage.  The person

13  has it available, makes his house available for that purpose.

14      In *Bell* we have a situation where a person was cooking

15  crack cocaine in his kitchen, wife and children there, there

16  was other evidence of drug paraphernalia there.

17      He gets arrested, and he tells his wife to get rid of the

18  dirty laundry.  She takes the dirty laundry away that happens

19  to have some of the drug paraphernalia in the basket as well

20  as some small baggies of crack cocaine.  Of course, that was

21  sufficient to establish that it was a significant purpose in

22  your words.

23      MR. ABELL:  Yes, and I believe the temporal duration

24  in *Bell* was about 20 months.  The two cases you've described,

25  Your Honor --

1    THE COURT:  Right.  So here we have a situation where

2    if we don't look at the timing, we just look at the

3    defendant's acknowledged purpose; we don't really have to dive

4    into it because he acknowledges the purpose was a stash house.

5    He was storing drugs for other individuals; right?  That's

6    what he admitted to when he entered his plea.

7    MR. ABELL:  Yes.

8    THE COURT:  Now, you've made the argument that, well,

9    we can't really apply this because it would be double

10   counting.  But if he'd been just charged with just the drugs

11   alone, or entered a plea just for the drugs alone he would

12   still have the same base offense level.  So the base offense

13   level doesn't calculate in or doesn't include the stash house

14   use; correct?

15   MR. ABELL:  That's correct.

16   THE COURT:  And then, just as recently as a couple of

17   days ago, the Sixth Circuit in *Hitch* --

18   MR. ABELL:  I read the case, Your Honor.  I think it

19   really takes the legs out from the double-counting argument, I

20   have to concede.

21   THE COURT:  All right.  It does.  So your position is

22   that in this situation there should not be an enhancement when

23   an individual acknowledges in a plea that he was operating a

24   stash house for other individuals.  That seems illogical to

25   me.

1          MR. ABELL:  Oh, I've made my argument.  Thank you.

2          THE COURT:  All right.  Any other arguments on this

3     point, Mr. Walker?

4          MR. WALKER:  Your Honor, the United States respects

5     the Court's references to the cases.  I believe that

6     Mr. Kiebler was under the mistaken impression that it was

7     double counting and that's why it wasn't put in there.

8          THE COURT:  It's a nonbinding plea.

9          MR. WALKER:  It is a nonbinding plea, and the facts

10     specifically get him to plead to that count and the facts

11     support the plea to that.

12          THE COURT:  So we have *Bell*, we have *Johnson*, we have

13     the *Hernandez* case that I was just talking about in a prior

14     hearing, which involved an abandoned warehouse.  Just a couple

15     of occasions where drugs were placed at the location until

16     they could be distributed, and the Sixth Circuit said that's

17     sufficient also.

18       So here we have the argument being made that the

19     guidelines are strict or have a higher standard than the

20     statute does, even though Judge Sutton -- Chief Judge Sutton

21     says they're essentially the same.  They have 856(a)(1) and

22     (a)(2) for a person that's actually using to distribute, a

23     person that's storing the drugs at that location.

24          MR. WALKER:  Yeah, I concur, Your Honor.

25          THE COURT:  All right.  The objection is overruled to

1    the drug house enhancement for the reasons stated.  And as

2    outlined, the defendant has entered a guilty plea to Count 9,

3    operating a stash house.  The base offense level does not

4    include that factual information for operating a stash house,

5    the increase only comes through the guideline enhancement that

6    is set forth in paragraph 23 under 2D1.1(b)(12), the objection

7    will be overruled.

8        I will adopt the findings that are contained in the

9    presentence report as well as the guideline calculations.  I

10   will review that with the parties in just a moment.

11       Before I do, I'll note that I've also reviewed the

12   various filings the parties have made prior to the hearing,

13   including the memorandum filed by the defendant in support of

14   a variance and his sentencing memorandum.

15       Now, turning to the presentence report, the guideline

16   calculations do begin at paragraph 19, which indicates that

17   the 2021 edition of the guidelines manual is used.

18       There is a grouping that takes place as reflected in

19   paragraph 20 of all counts of conviction, with the exception

20   of Count 4, which requires a minimum sentence -- a statutory

21   minimum sentence consecutive to the term for the drug charges

22   and the other counts.

23       Counts 1, 3, 8, and 9 are grouped pursuant to those --

24   excuse me, those guideline sections.  For that first count

25   group, the base offense level is 36 based upon drug quantity

9

1    attributed to the defendant of over 30,000 kilograms of

2    converted drug weight.  That's base offense level 36.

3         There's a two-level increase for operating the stash

4    house as reflected, again, in that paragraph 23.  There's a

5    three-level reduction shown for acceptance of responsibility.

6    Before the Court may apply the third-level acceptance credit,

7    it does require a motion from the United States.

8         Mr. Walker?

9              MR. WALKER:  United States so moves, Your Honor.

10             THE COURT:  Motion is sustained; that reduces the

11   total offense level to a level 35.

12        The defendant in this case has one criminal history point

13   which places him in Criminal History Category 1 for purposes

14   of calculating the guideline range.

15        The guideline range for these counts, other than the

16   mandatory minimum term required by Title 18, Section 924(c),

17   is a range of 168 to 210 months as reflected in paragraph 63,

18   with the 60 months required consecutive under that statutory

19   Section 924.

20        The terms, by statute, that are required for supervised

21   release are set forth in paragraph 65, and then 67 has the

22   guideline provisions for supervision for Counts 1 and 8.  The

23   guidelines term for supervision is five years; for Count 3, is

24   three years; for Count 4, is two to five years; for Count 9 is

25   one to three years.

1     The fine range in the case as set forth in paragraph 73

2     is a range of $40,000 on the low end to $21 million on the

3     high end.  Again, those are the guideline calculations that

4     are adopted in this matter.

5         We'll turn to allocution in just a moment.  First, let me

6     see if there are any motions to take up.  I believe the United

7     States was intending to move to dismiss Count 7 of the

8     superseding indictment; is that accurate?

9              MR. WALKER:  That's correct, Your Honor.

10             THE COURT:  That motion will be sustained.  That

11    count will be dismissed effective upon entry of the judgment

12    in the case.

13        I also note, before we proceed with allocution, that I

14    have received a number of letters that have been filed in the

15    case in Docket Entry Number 130, and those letters will also

16    be taken into account in imposing sentence in the case.

17        All right.  Thank you.

18        Mr. Abell, I'll turn to you at this time.  I'll hear from

19    you in allocution and also you may address the motion for a

20    variance, which is reflected -- the motion and then the

21    supporting memorandum at Docket Entries 124 in this case.

22             MR. ABELL:  Thank you, Your Honor.  I just want to

23    elaborate briefly on points raised in the memorandum and in

24    the presentence report.  First, Mr. Petitfrere has personal

25    history and characteristics that, has a good employment

1   record, pretty steady all the way from time he got out of high

2   school until the employment with LFUCG that Mr. Johnson

3   describes wound down.  He had jobs of some pretty significant

4   responsibility and acquired some good occupational

5   organizational skills that can serve him well.

6   He improved himself by getting some education from BCTC

7   that was sporadic, but nevertheless was some progress.

8   The letters that have been submitted I think speak well

9   to him as a contributing, caring, community member.  He did

10  some good things and helped people and had a pretty good

11  citizenship record prior to his involvement in this case.  And

12  respectfully, Your Honor, I think that weighs pretty strongly

13  and heavily in favor of the variance.

14  The second point, I have to say I was surprised at the

15  volume of case law I found regarding the point that drug

16  purity overstates culpability, at least with regard to

17  methamphetamine cases, because a very, very high percentage

18  involves purity ratings similar to that involved in this case.

19  A number of courts, I think I gave four specific

20  examples, have resolved that an appropriate resolution is to

21  basically adopt the guidelines calculation would be applicable

22  to a substance containing a detectable amount of

23  methamphetamine.  That would be a four-level adjustment here.

24  And we mentioned the *Hitch* case a little while -- a few

25  minutes ago, and it didn't -- obviously it eliminated the

1   double-counting argument that I made, but it did emphasize the

2   importance of the application note.  And part of the argument

3   as to the drug purity is the notion was purity equals somebody

4   higher up in an organization closer to the manufacturing

5   point.  And that experience has shown, at least with respect

6   to methamphetamine, that that's no longer the case.  I believe

7   it's Comment 27C, if I'm not mistaken, cited in some of the

8   opinions.

9       The Court, of course, consistent with *Gall* and other

10  cases, had authority to depart from the guidelines.  And, Your

11  Honor, I think this is a better grounds -- I also mention drug

12  quantity, but here you have the Commission telling us purity

13  is a distinction -- a 10 X distinction is made with respect to

14  purity for a particular reason, and the grounds for that

15  reason have -- it appears have been superseded by events and

16  experience.

17      THE COURT:  Well, that's just one reason for the

18  difference; right?  Because we also have -- purity can also

19  increase the dangerousness of a particular drug, and it also

20  can distinguish between a person that has, let's say, two

21  kilograms of actual methamphetamine, and then what's later

22  distributed if there is a mixture; right?

23      MR. ABELL:  No, there are other reasons, and the

24  cases I've cited, I think it was seven or eight of them, have

25  acknowledged that.

1        THE COURT:  Yeah, there are a number of judges across
2    the country that would completely ignore the differences
3    between actual methamphetamine, a mixture containing
4    methamphetamine, as happened with cocaine several years ago.
5    Some judges may do the same thing with fentanyl.  Say it's
6    fentanyl, so what difference does it make?  Let's just look at
7    what's present, the quantity that's present.
8        But we know that that's probably the best example of a
9    drug that can be very dangerous when it's in its purest form,
10   even more so than when it's cut.
11       Now, it certainly can be dangerous, deadly if it's cut
12   and it's not mixed well, which is what happens quite often,
13   but it's still a very deadly drug in its pure form.  But I
14   suppose you would argue that we shouldn't make any distinction
15   between methamphetamine, cocaine, marijuana; right?
16       MR. ABELL:  Well, I'm making a much more limited
17   argument today based on --
18       THE COURT:  Well, by extension, that would be your
19   argument today.
20       MR. ABELL:  Well, I'm --
21       THE COURT:  Let's ignore quantity and let's ignore
22   quality; right?  Isn't that what you're saying?
23       MR. ABELL:  Well, no, I'm saying and bringing to the
24   Court's attention a number of cases, not just a smattering of
25   two or three here or there, but quite a number of cases of

1    district judges --

2         THE COURT:  What percentage would that be out of all

3    the cases that are sentenced across the country?

4         MR. ABELL:  I couldn't say that.  I don't know that

5    there has been --

6         THE COURT:  Well, we know that methamphetamine is the

7    drug that results in the largest number of convictions now.

8    We know fentanyl is increasing, but we know methamphetamine

9    right now is number one.  So 15,000 cases last year, I think,

10   isn't that the number?  So this would be nine out of 15,000?

11        MR. ABELL:  I don't think we can conclude that there

12   are just nine.

13        THE COURT:  No, my point is, there's lies, damn lies,

14   and statistics.  And you're giving me a few examples across

15   the country of judges that believe that the guidelines should

16   not be applied in the way that they're currently set up.  But

17   there are, I think, probably a larger number of judges that

18   would follow the guidelines under this scenario.

19        MR. ABELL:  It is a good collection of authority,

20   though, that I'm urging the Court to consider.

21        THE COURT:  Go ahead, I'm listening.

22        MR. ABELL:  There is, of course, 60 months pursuant

23   to the 924(c) charge.  The gun was recovered from the

24   passenger compartment of a vehicle.  As it was in other cases

25   where simply the enhancement has been applied, that makes

1    about an 18 month difference in the guidelines calculation

2    here.

3        I urge the Court to impose the variance if used -- if you

4    adopted the point regarding the purity, you would have a level

5    32 with regard to that.  The range on the non-924(c) charges

6    would be 108 to 135 months; almost the middle of that is 120

7    plus 60 gets us to 180.

8        The Court's brought up on a number of prior occasions the

9    recidivism reports the Commission has put out, most recently,

10   I believe last June.  And they do make distinctions that the

11   Court's made before.  I did not find in there a distinction

12   recidivism as for someone would get a 180-month sentence as

13   opposed to a 210-month sentence.

14           THE COURT:  What's the trend line show in those

15   reports?  What does the trend line show in those reports?

16   Which direction is it going as we go from -- if we go from

17   zero to 60 months to 120 months, what's the trend line going

18   in terms of whether longer sentences create greater

19   deterrence?

20           MR. ABELL:  I think the sharpest difference is

21   between 60 and 120 months as opposed to zero to 60 months was

22   a slightly -- I want to say it goes to 18 to 29 percent as we

23   go up above 120 months as compared to between 60 and 120.  So

24   it flattens out a little bit at 120 months.

25           THE COURT:  Is it going further south or north?  Is

1   the line going further south or north as we go from zero to 60

2   to 120?

3            MR. ABELL:  Does it go south or north?

4            THE COURT:  Is it going down or going up?  In other

5   words -- let's just get the report and look at it.

6         Your argument is that essentially because we don't have

7   statistical information beyond that 120-month level, we can't

8   really conclude that a sentence of 180 months would provide

9   greater deterrence than a sentence of 120 or some other term;

10  correct?  Is that the argument you're making?

11           MR. ABELL:  Not exactly.  But I think 180 month

12  sentence adequately addresses concerns of recidivism, given

13  his personal characteristics, because they do include a number

14  of factors that the report identifies as cutting against

15  recidivism concerns.

16           THE COURT:  I'm looking at the 2022 report.  Table 4

17  on page 19 talks about the regression analysis, and we go

18  from -- let's just start here at 36 to 48 months, minus two

19  percent, that reduces recidivism by that number.  48 to

20  61 percent, so there's really no distinction until we get to

21  60, and then 60 to 120, 18 percent; over 120 months,

22  29 percent.

23        So the report indicates over 120 months, there is a

24  greater recidivist effect or reduction in recidivism at those

25  numbers.  All right.  Go ahead.

1      MR. ABELL:  The report also indicated, Your Honor,

2 that some personal characteristics applicable here are minimal

3 prior criminal history and educational level, absence of

4 violence as well, are factors for an individual that,

5 considered on the whole, I suppose, would weigh against him

6 being a candidate to recidivate.

7      But for those reasons, respectfully, Your Honor, I urge

8 the Court to grant a variance and impose a sentence of

9 180 months.

10      THE COURT:  All right.  Thank you.

11      Mr. Petitfrere, would you like to add anything to what

12 Mr. Abell has said on your behalf?

13      THE DEFENDANT:  Yeah.

14      THE COURT:  Yes, sir.

15      THE DEFENDANT:  I've never actually been in front of

16 a judge before waiting to be sentenced.  I do realize the

17 severity of the charges against me and I do take full

18 responsibility for them because I do know that I'm not above

19 the law.

20      But with that being said, I don't believe that this is

21 the end for me personally, and given a second chance, I do

22 believe that I can get back to the road of redemption.  Thank

23 you.

24      THE COURT:  All right.  Thank you.

25      Mr. Walker.

1          MR. WALKER:  Your Honor, the United States does agree

2     with Mr. Abell that Mr. Petitfrere does have a limited

3     criminal history background and that is a factor in his favor.

4          THE COURT:  That certainly is an indication of

5     reduced risk of recidivism under the 2016 report --

6          MR. WALKER:  Yes, Your Honor.

7          THE COURT:  -- correct?  It doesn't say that there's

8     no risk, but there is less risk of a person that's in Criminal

9     History Category 1, or only has one criminal history point.

10         MR. WALKER:  And that's true.  And the fact that

11    Mr. Petitfrere has shown that he has some interest in

12    advancing his education previously, and during the period of

13    his incarceration he will be offered that opportunity to

14    engage in that in addition.

15         However, there are two factors that the United States

16    would argue warrant a significant sentence in this case.

17    Mr. Petitfrere was arrested in January, I believe, for an

18    offense that involved a firearm and was in possession of

19    fentanyl at that time and was released and continued to engage

20    in the conduct that resulted in his storing a large quantity

21    of fentanyl at his residence for this conspiracy.

22         And the fact that he was already under indictment for a

23    drug trafficking crime with a gun and that wasn't enough to

24    get his attention to say, I need to stop, is quite concerning.

25         And the second factor, as the Court has alluded to, we're

1    dealing with a drug that's not just a drug that the quantity

2    is significant, but is a very dangerous drug.

3         THE COURT:  Well, both certainly, but one, I suppose,

4    you could argue more than the other.

5         MR. WALKER:  Yes.

6         THE COURT:  Fentanyl is deadly, absolutely deadly.

7         MR. WALKER:  Absolutely.  And as opposed to cocaine

8    or methamphetamine, neither one of those drugs are the type of

9    drugs that have lead to overdose deaths at the rate and the

10   manner that fentanyl does.

11        And that, in and of itself, makes these sentences and the

12   guideline range very important for the Court to consider in

13   imposing sentencing.

14        So in considering those factors that I've named, and also

15   to deter this defendant and others, and promote respect for

16   the law, the nature of these offenses warrant a sentence

17   within the guideline range and the imposition of the mandatory

18   60 months following.

19        THE COURT:  Mr. Abell argues, in part, that because

20   the Sentencing Commission years ago included an application

21   note that explained, in part, the reason for higher guideline

22   ranges for purity was because, as drugs were being sold, they

23   were being cut.  Let's use cocaine as an example.

24        The head person may have pure cocaine, but then it's sold

25   to a mid-level person who cuts it, and then sold to another

1    who then may distribute it at the street level or may cut it

2    again.  And so you have a distinction being made based on the

3    tiering approach of who's the most culpable in that particular

4    case, the head person or someone below that.

5        But now we have a situation here we're having fentanyl

6    sold in its pure form on the street, most of the time

7    disguised as heroin.  But fentanyl is being sold on the

8    street, and we're having crystal methamphetamine being sold,

9    being brought across the border from Mexico, either from labs

10   in Mexico or perhaps in China, but it's being brought across

11   the border and sold in its pure form, crystal methamphetamine

12   as it's defined in the guidelines.

13       So the argument goes, well, we're having lower level

14   individuals that are selling more pure drugs than the

15   application note really was concerned with or was added to

16   explain that situation.  So why shouldn't the drug tables be

17   ignored or the Court perform its own calculation based upon

18   changed circumstances over time?

19           MR. WALKER:  Well, as this Court is well aware, there

20   is a distinct difference between the quality of pure

21   methamphetamine, crystal methamphetamine, and diluted

22   fentanyl.  The fact of the matter is that a tenth of a gram of

23   fentanyl is sufficient to cause someone's death.  And that

24   amount is substantially less than even the grams of

25   methamphetamine -- pure crystal meth that is being sold at the

1    lower level.

2        And it is such a dangerous drug that the amount

3    differential is not the basis for a reduction of -- in the

4    guideline range that's calculated by the Commission.

5        And the United States would argue, Your Honor, that that,

6    in and of itself, is sufficient to warrant a continuation of

7    following the Commission's guidelines.

8        THE COURT:  So in this case we have one point --

9    almost 1.8 kilograms, 1,797 grams of fentanyl.  The typical

10   dose, tenth of a gram.

11       MR. WALKER:  Yes, Your Honor.

12       THE COURT:  So that would be nearly 18,000 doses from

13   that fentanyl alone, that's without addressing the issue of

14   actual methamphetamine.  The difference, I think, in

15   methamphetamine mixture versus actual in the drug table is one

16   gram is converted to two kilograms or 20 kilograms or ten

17   times more for actual methamphetamine.  And it's the

18   government's position that there is a distinction and there's

19   a reason for the distinction; is that fair?

20       MR. WALKER:  That's correct, Your Honor.

21       THE COURT:  Based upon the dangerousness of both of

22   these two substances, regardless of what cases have been

23   saying about cocaine or about methamphetamine, these recent

24   cases.

25       MR. WALKER:  Absolutely.

1          THE COURT:  The next point that's raised -- I do want

2    you to address -- in the defendant's memorandum, is basically

3    the argument that the government is being arbitrary in this

4    case.

5          Now, the defendant freely, and voluntarily, knowingly

6    entered a plea on 924(c), possessing a firearm in furtherance

7    of a drug trafficking crime.

8          Mr. Abell takes the point, well, you could have just

9    included a two-point enhancement by not charging that because

10   a weapon was present, and sometimes the government does that.

11         Is your argument based in part upon the arrest that you

12   just noted just a moment ago?  The defendant was arrested,

13   state charges, the date of the arrest is January 13th, and was

14   then released and then continued in the activity with a gun?

15         MR. WALKER:  Well, Your Honor, the United States has

16   an internal procedure in which it follows in determining

17   whether an 924(c) is appropriate.  And a large part of that

18   has to do with the factors that the Court would give on

19   instructions for a 924(c) to the jury.  And when you consider

20   those factors that the defendant, although not a convicted

21   felon, the fact that he was in possession of a firearm that

22   was relatively close to a large quantity of drugs, and that he

23   could protect the drugs or money, warranted the 924(c) charge

24   in this case.

25         And if the factors were different, the United States

1    would -- may agree to the approach that he argues that the

2    Court referred to.  But in this particular instance, the

3    United States believes and the defendant has admitted that

4    that was, in fact, the case.

5          THE COURT:  There's an additional element.  In other

6    words, he has to acknowledge that he possessed it in

7    furtherance of the drug trafficking crime that's identified in

8    the indictment as opposed to just possessing a firearm --

9          MR. WALKER:  Yes.

10          THE COURT:  -- during the time that he's charged with

11    the drug trafficking offense.

12    Is 180 months sufficient to reduce any recidivism

13    concerns as argued in the fourth argument in the sentencing

14    memorandum of the defendant?

15          MR. WALKER:  No, Your Honor.  The United States would

16    strongly argue that the guideline range as calculated is the

17    appropriate guideline range and the Court should impose a

18    sentence within that guideline range.

19          THE COURT:  All right.  Thank you.  Thank you,

20    Counsel, for responding to my questions.

21    Of course, this is a matter in which the defendant

22    entered a plea to several charges.  There's one charge that

23    has been dismissed, but this is a very serious matter and the

24    Court does begin the analysis of an appropriate sentence by

25    looking at the properly calculated guideline range.

1    And in this case, before the Court considers the 60-month

2    consecutive sentence for the 924(c) conviction, the guideline

3    range is 168 to 210 months.

4    The defendant does make a number of arguments, both legal

5    as well as factual, that the Court should consider in going

6    below the guideline range, down to 120 months for those counts

7    other than the 924 count, including issues of recidivism,

8    likelihood of reoffending, the fact that the defendant has

9    little criminal history, his educational level.

10    A number of factors that are outlined in the memorandum

11    in addition to these legal arguments that we've been

12    addressing, such as whether the guidelines that increase based

13    on purity levels, actual methamphetamine, for example, should

14    effectively be ignored, and the Court should only be looking

15    at mixtures, and that would have the effect of reducing the

16    base offense level by four levels.

17    But I'm not going to do that.  I think that would be

18    incorrect to ignore purity levels or quantity levels in cases

19    such as this.

20    This defendant was engaged in drug trafficking activities

21    with a firearm in furtherance of those activities.  And the

22    drugs are very serious, they're very dangerous drugs as

23    numerous courts have recognized and acknowledged.  And to vary

24    downward for the reasons, those legal arguments that are made,

25    would be inappropriate, in my opinion, in this particular

1  case.

2       That's not to say in other circumstances a better

3  argument could not be made, but in this case, this was a

4  defendant that was engaged in drug trafficking and using his

5  residence to store quantities of drugs, significant quantities

6  of drugs on behalf of other individuals.

7       And the guidelines are properly calculated and the

8  guideline range does produce a starting point for the

9  analysis.

10      But many of the arguments that have been made by counsel

11  do then go to either a sentence within the range or perhaps

12  other reasons for a variance in the case, such as the

13  defendant's lack of criminal history, his educational level,

14  low level of recidivism based upon a number of those factors.

15      They, in my opinion, when I consider the factors of 3553,

16  would support a sentence at the bottom of the range but would

17  not support a variance in the case, and the request for a

18  variance will be denied.

19      It's my determination, when I consider the factors of

20  3553, that a sentence of 168 months, plus 60 months for the

21  924(c) count would be the appropriate sentence in this

22  particular case.

23      Now, going through these factors, these 3553 factors,

24  first, they do include, of course, the nature and

25  circumstances of the offense, as well as the history and

1     characteristics of the defendant.

2         We've already discussed the circumstances of the offense,

3     his involvement in the offense, which is more fully set forth

4     in the presentence report.  I've also considered the

5     defendant's history and characteristics, which some factors

6     have been pointed out by counsel, and others are identified in

7     the letters that have been submitted.  They do not outweigh

8     the circumstances of the offense in this particular matter and

9     would not support a variance below the guideline range.

10        The next factors that the Court considers under

11    3553(a)(2), those include the parsimonious principles that the

12    Court should impose a sentence that's sufficient but not

13    greater than necessary to address these issues.  And they

14    include, again, the seriousness of the offense, the need to

15    promote respect for the law, and to provide a just punishment.

16        I conclude that a sentence within the guideline range

17    would provide just punishment in the case and it would

18    provide -- it would promote respect for the law.  In this

19    case, while the defendant does have limited criminal history,

20    he did continue drug trafficking activities following his

21    state arrest, as reflected in the presentence report.

22        And so I can't put complete confidence in the assertions

23    and the arguments that have been made that he would not

24    re-engage in drug trafficking activity at some point.  And I

25    do conclude, as the sentence would increase, that likelihood

1    of -- or reduction of recidivism would also occur.

2         A sentence within the guideline range would provide

3    adequate deterrence both to this defendant as well as to

4    others that might be inclined to commit a similar offense.

5         I will recommend to the Bureau of Prisons that the

6    defendant participate in job skills and vocational training

7    programs under the issue of rehabilitation, and the factor

8    that the Court is to consider under 3553(a)(2)(D).  I have

9    considered the types of sentences that are available in the

10   case, as well as all policy statements, and I have considered

11   the need to avoid unwarranted sentencing disparities among

12   defendants with similar records who have been found guilty of

13   similar conduct.

14        With regard to that last issue, of course, the Court

15   acknowledges that this is a nationwide issue, issue of

16   sentencing disparities, but I'm of the belief that to impose a

17   sentence within the guideline range would not constitute an

18   unwarranted sentencing disparity.

19        I am mindful that many judges do vary downward in

20   particular cases, but that does not mean that the Court must,

21   in every situation, vary downward because other judges do

22   that.

23        Again, the Court considers all individual characteristics

24   of the defendant in making these determinations, and I'll

25   announce the sentence.

1       It will be the sentence of the Court, pursuant to the

2    Sentencing Reform Act of 1984, as modified by the decisions in

3    *Booker* and *Fanfan*, I do find the following sentence to be

4    sufficient but not greater than necessary to comply with the

5    purposes of the statute, Title 18, Section 3553(a):

6       Therefore, it will be the judgment of the Court that the

7    defendant, Marc Andre Petitfrere, also known as Marc

8    Petitfrere, is committed to the custody of the Bureau of

9    Prisons for 168 months on each of Counts 1, 3, 8, and 9, and

10   60 months on Count 4, to be served consecutively to the

11   sentence under Counts 1, 3, 8, and 9 for a total term of

12   228 months.

13      As indicated, I will recommend to the Bureau of Prisons

14   that the defendant participate in a job skills and vocational

15   training program during the period of incarceration.

16      Upon release, he'll be placed upon supervision for terms

17   of five years on each of Counts 1, 4, and 8, and three years

18   on Counts 3 and 9, to be served concurrently.  That will

19   produce a total term of supervision of five years.

20      Within 72 hours of release, he must report in person to

21   the probation office in the district in which he is released.

22   While on supervision, he may not commit another federal,

23   state, or local crime.  He must comply with the mandatory and

24   the standard conditions adopted by the Court and that will be

25   set forth in the judgment and commitment order.

29

1        The special conditions will include that the defendant

2    may not use or consume marijuana or marijuana products, even

3    if that substance were to be prescribed to him by a physician,

4    licensed professional, or other person during the period of

5    supervision.

6        He must participate in urinalysis testing or any other

7    form of substance abuse testing as directed by the probation

8    officer.  You must refrain from obstructing or attempting to

9    obstruct, or tamper in any fashion with the efficiency and

10   accuracy of any substance abuse testing required as a

11   condition of supervision.  He may not knowingly use or consume

12   any substance that interferes with the accuracy of substance

13   abuse testing.

14       And based upon the very serious nature of this offense

15   and the presence of a firearm, I will -- that was possessed in

16   furtherance of the drug trafficking crimes, I will include a

17   search condition.

18       He's required to submit his person as well as any

19   offices, properties, homes, residences, vehicles, storage

20   units, papers, computers, other electronic communications, or

21   cloud storage locations, data storage locations, or any media

22   to a search conducted by the probation office.  The failure to

23   submit to a search would be grounds for revocation of

24   supervision, and he must warn any occupants that the premises

25   would be subject to a search according to this condition.

1    He's also required to provide the probation office with

2    access to any requested financial information.  And while the

3    Court will not impose a fine in the case, the Court does

4    impose this condition to ensure that the defendant does not

5    re-engage in drug trafficking activities.

6    Based upon his current financial situation, as indicated,

7    I will waive the fine requirement and the requirement for

8    community restitution, but he will be ordered to pay to the

9    United States a special assessment of $100 for each count of

10   conviction; that's a total of $500.

11   And the judgment will reflect forfeiture of the items

12   listed in the forfeiture allegation, which includes three sums

13   of currency, $39,700, $33,960, and $32,800, as well as a Glock

14   pistol bearing serial number BTWF458 and a Canuk pistol

15   bearing serial number T6472-16AP09310.

16   And then following this proceeding, the defendant will be

17   remanded back to the custody of the United States Marshal

18   pending designation for service of his sentence.

19   Let's see.  I believe in the plea agreement, the

20   defendant waived the right to appeal the guilty plea and

21   conviction, but has reserved the right to appeal the sentence.

22   So in just a moment, I will ask the clerk to advise the

23   defendant of those appellate rights.

24   Before I do so, I'll ask counsel to state any objections

25   that they may have, first to the sentence that has been

1    announced, that would include conditions of supervision.

2    Second would be any objections under *United States vs. Bostic*.

3    Under that decision from the Sixth Circuit, any objections not

4    previously raised should be raised at this time so that they

5    may be addressed by the Court to be properly preserved for

6    review on appeal.

7         Finally, if the parties would like the Court to make any

8    additional findings to support any of the matters that have

9    been determined, I'll certainly do so upon request.

10        Mr. Walker.

11        MR. WALKER:  Your Honor, the United States has no

12   objections to the sentence and the supervised release

13   conditions that the Court has imposed, no *Bostic* objections,

14   and no request for additional findings.

15        THE COURT:  Thank you.

16        And Mr. Abell.

17        MR. ABELL:  Your Honor, I don't request any

18   additional findings, don't request any *Bostic* findings, I have

19   no objections to the sentence beyond those previously stated

20   and urged.  Thank you.

21        THE COURT:  Thank you.

22        Madam Clerk, if you would please advise the defendant of

23   his appellate rights with regard to the sentence.

24        COURTROOM DEPUTY:  Yes, Your Honor.

25        (The form entitled "Court's Advice of Right to

32

1    Appeal" was read aloud in open court by the clerk, and said

2    form was signed by the defendant.)

3         THE COURT:  Thank you.

4    Mr. Abell, if you would please pick up the acknowledgment

5    of rights, I'll ask you to review that with the defendant.

6    After he's assured himself he understands those rights, I

7    would ask that he sign the original document and there's a

8    copy that he can keep for his records.

9         Finally, Mr. Abell, if Mr. Petitfrere chooses to appeal,

10   of course, this would not apply, but if he chooses not to

11   appeal, after the 14-day period has expired for filing a

12   notice of appeal, if you could please file a statement in the

13   record indicating that you conferred with him and it was his

14   decision.

15        Let's see.  Madam Clerk, we have hearings at 3:00 or has

16   that been continued?

17        COURTROOM DEPUTY:  They have been continued.

18        THE COURT:  Next hearing is at 4:00?  All right.

19   Let's see if we have any other issues to take up in the case.

20        MR. WALKER:  Nothing from the United States, Your

21   Honor.

22        THE COURT:  Mr. Abell?

23        MR. ABELL:  No, Your Honor, thank you.

24        THE COURT:  We'll be in recess until 4:00 p.m.

25        (Proceedings concluded at 2:48 p.m.)

33

1                        C E R T I F I C A T E

2           I, ELAINE S. HABERER, RPR, certify that the
   foregoing is a correct transcript from the record of
3  proceedings in the above-entitled case.

4
    _/s/ Elaine S. Haberer              April 13, 2023
5  ELAINE S. HABERER, RPR              Date of Certification
   Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25